(Slip Opinion)          OCTOBER  TERM,  2004          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TOWN OF CASTLE ROCK, COLORADO *v.* GONZALES, INDIVIDUALLY AND AS NEXT BEST FRIEND OF HER DECEASED MINOR CHILDREN, GONZALES ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 04–278.   Argued March 21, 2005—Decided June 27, 2005

Respondent filed this suit under 42 U. S. C. §1983 alleging that petitioner violated the Fourteenth Amendment's Due Process Clause when its police officers, acting pursuant to official policy or custom, failed to respond to her repeated reports over several hours that her estranged husband had taken their three children in violation of her restraining order against him.  Ultimately, the husband murdered the children.  The District Court granted the town's motion to dismiss, but an en banc majority of the Tenth Circuit reversed, finding that respondent had alleged a cognizable procedural due process claim because a Colorado statute established the state legislature's clear intent to require police to enforce retraining orders, and thus its intent that the order's recipient have an entitlement to its enforcement.  The court therefore ruled, among other things, that respondent had a protected property interest in the enforcement of her restraining order.

*Held:* Respondent did not, for Due Process Clause purposes, have a property interest in police enforcement of the restraining order against her husband. Pp. 6–19.

   (a) The Due Process Clause's procedural component does not protect everything that might be described as a government "benefit": "To have a property interest in a benefit, a person . . . must . . . have a legitimate claim of entitlement to it."  *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577.  Such entitlements are created by existing rules or understandings stemming from an independent source such as state law. *E.g., ibid.*  Pp. 6–7.

(b) A benefit is not a protected entitlement if officials have discretion to grant or deny it. See, *e.g., Kentucky Dept. of Corrections* v. *Thompson,* 490 U. S. 454, 462–463. It is inappropriate here to defer to the Tenth Circuit's determination that Colorado law gave respondent a right to police enforcement of the restraining order. This Court therefore proceeds to its own analysis. Pp. 7–9.

(c) Colorado law has not created a personal entitlement to enforcement of restraining orders. It does not appear that state law truly made such enforcement *mandatory.* A well-established tradition of police discretion has long coexisted with apparently mandatory arrest statutes. Cf. *Chicago* v. *Morales,* 527 U. S. 41, 47, n. 2, 62, n. 32. Against that backdrop, a true mandate of police action would require some stronger indication than the Colorado statute's direction to "use every reasonable means to enforce a restraining order" or even to "arrest . . . or . . . seek a warrant." A Colorado officer would likely have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the violation's circumstances or competing duties counsel decisively against enforcement in a particular instance. The practical necessity for discretion is particularly apparent in a case such as this, where the suspected violator is not actually present and his whereabouts are unknown. In such circumstances, the statute does not appear to require officers to arrest but only to seek a warrant. That, however, would be an entitlement to nothing but procedure, which cannot be the basis for a property interest. Pp. 9–15.

(d) Even if the statute could be said to make enforcement "mandatory," that would not necessarily mean that respondent has an entitlement to enforcement. Her alleged interest stems not from common law or contract, but only from a State's *statutory* scheme. If she was given a statutory entitlement, the Court would expect to see some indication of that in the statute itself. Although the statute spoke of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. Most importantly, it spoke directly to the protected person's power to "initiate" contempt proceedings if the order was issued in a civil action, which contrasts tellingly with its conferral of a power merely to "request" initiation of criminal contempt proceedings—and even more dramatically with its complete silence about any power to "request" (much less demand) that an arrest be made. Pp. 15–17.

(e) Even were the Court to think otherwise about Colorado's creation of an entitlement, it is not clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for due process purposes. Such a right would have no ascertainable monetary value and would arise incidentally, not out of some

Syllabus

new species of government benefit or service, but out of a function that government actors have always performed—arresting people when they have probable cause. A benefit's indirect nature was fatal to a due process claim in *O'Bannon* v. *Town Court Nursing Center,* 447 U. S. 773, 787. Here, as there, "[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only . . . incidentally, provides a sufficient answer to" cases finding government-provided services to be entitlements. *Id.,* at 788. Pp. 17–19.

366 F. 3d 1093, reversed.

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SOUTER, J., filed a concurring opinion, in which BREYER, J., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–278

_____

## TOWN OF CASTLE ROCK, COLORADO, PETITIONER *v.* JESSICA GONZALES, INDIVIDUALLY AND AS NEXT BEST FRIEND OF HER DECEASED MINOR CHILDREN, REBECCA GONZALES, KATHERYN GONZALES, AND LESLIE GONZALES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 27, 2005]

JUSTICE SCALIA delivered the opinion of the Court.

We decide in this case whether an individual who has obtained a state-law restraining order has a constitutionally protected property interest in having the police enforce the restraining order when they have probable cause to believe it has been violated.

I

The horrible facts of this case are contained in the complaint that respondent Jessica Gonzales filed in Federal District Court. (Because the case comes to us on appeal from a dismissal of the complaint, we assume its allegations are true. See *Swierkiewicz* v. *Sorema N. A.,* 534 U. S. 506, 508, n. 1 (2002).) Respondent alleges that petitioner, the town of Castle Rock, Colorado, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution when its police officers, acting pursuant to official policy or custom, failed to respond properly

to her repeated reports that her estranged husband was violating the terms of a restraining order.[1]

The restraining order had been issued by a state trial court several weeks earlier in conjunction with respondent's divorce proceedings. The original form order, issued on May 21, 1999, and served on respondent's husband on June 4, 1999, commanded him not to "molest or disturb the peace of [respondent] or of any child," and to remain at least 100 yards from the family home at all times. 366 F. 3d 1093, 1143 (CA10 2004) (en banc) (appendix to dissenting opinion of O'Brien, J.). The bottom of the preprinted form noted that the reverse side contained "IMPORTANT NOTICES FOR RESTRAINED PARTIES AND LAW ENFORCEMENT OFFICIALS." *Ibid.* (emphasis deleted). The preprinted text on the back of the form included the following "**WARNING**":

> "**A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME** . . . . A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. **YOU MAY BE ARRESTED** WITHOUT NOTICE IF A LAW ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER." *Id.,* at 1144.

The preprinted text on the back of the form also included a "**NOTICE TO LAW ENFORCEMENT OFFICIALS**," which read in part:

---

[1] Petitioner claims that respondent's complaint "did not allege . . . that she ever notified the police of her contention that [her husband] was actually in violation of the restraining order." Brief for Petitioner 7, n. 2. The complaint does allege, however, that respondent "showed [the police] a copy of the [temporary restraining order (TRO)] and requested that it be enforced." App. to Pet. for Cert. 126a. At this stage in the litigation, we may assume that this reasonably implied the order was being violated. See *Steel Co.* v. *Citizens for Better Environment,* 523 U. S. 83, 104 (1998).

"YOU SHALL USE EVERY REASONABLE MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER AND THE RESTRAINED PERSON HAS BEEN PROPERLY SERVED WITH A COPY OF THIS ORDER OR HAS RECEIVED ACTUAL NOTICE OF THE EXISTENCE OF THIS ORDER." *Ibid.*

On June 4, 1999, the state trial court modified the terms of the restraining order and made it permanent. The modified order gave respondent's husband the right to spend time with his three daughters (ages 10, 9, and 7) on alternate weekends, for two weeks during the summer, and, "'upon reasonable notice,'" for a mid-week dinner visit "'arranged by the parties'"; the modified order also allowed him to visit the home to collect the children for such "parenting time." *Id.,* at 1097 (majority opinion).

According to the complaint, at about 5 or 5:30 p.m. on Tuesday, June 22, 1999, respondent's husband took the three daughters while they were playing outside the family home. No advance arrangements had been made for him to see the daughters that evening. When respondent noticed the children were missing, she suspected her husband had taken them. At about 7:30 p.m., she called the Castle Rock Police Department, which dispatched two officers. The complaint continues: "When [the officers] arrived . . . , she showed them a copy of the TRO and requested that it be enforced and the three children be returned to her immediately. [The officers] stated that

there was nothing they could do about the TRO and sug-
gested that [respondent] call the Police Department again
if the three children did not return home by 10:00 p.m."
App. to Pet. for Cert. 126a.[2]

At approximately 8:30 p.m., respondent talked to her
husband on his cellular telephone. He told her "he had the
three children [at an] amusement park in Denver." *Ibid.*
She called the police again and asked them to "have some-
one check for" her husband or his vehicle at the amuse-
ment park and "put out an [all points bulletin]" for her
husband, but the officer with whom she spoke "refused to
do so," again telling her to "wait until 10:00 p.m. and see
if" her husband returned the girls. *Id.,* at 126a–127a.

At approximately 10:10 p.m., respondent called the
police and said her children were still missing, but she
was now told to wait until midnight. She called at mid-
night and told the dispatcher her children were still miss-
ing. She went to her husband's apartment and, finding
nobody there, called the police at 12:10 a.m.; she was told
to wait for an officer to arrive. When none came, she went
to the police station at 12:50 a.m. and submitted an inci-
dent report. The officer who took the report "made no
reasonable effort to enforce the TRO or locate the three
children. Instead, he went to dinner." *Id.,* at 127a.

At approximately 3:20 a.m., respondent's husband
arrived at the police station and opened fire with a semi-
automatic handgun he had purchased earlier that eve-
ning. Police shot back, killing him. Inside the cab of his
pickup truck, they found the bodies of all three daughters,
whom he had already murdered. *Ibid.*

On the basis of the foregoing factual allegations, re-

_____

[2] It is unclear from the complaint, but immaterial to our decision,
whether respondent showed the police only the original "TRO" or also
the permanent, modified restraining order that had superseded it on
June 4.

spondent brought an action under Rev. Stat. §1979, 42 U. S. C. §1983, claiming that the town violated the Due Process Clause because its police department had "an official policy or custom of failing to respond properly to complaints of restraining order violations" and "tolerate[d] the non-enforcement of restraining orders by its police officers." App. to Pet. for Cert. 129a.[3]  The complaint also alleged that the town's actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" respondent's civil rights. *Ibid.*

Before answering the complaint, the defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The District Court granted the motion, concluding that, whether construed as making a substantive due process or procedural due process claim, respondent's complaint failed to state a claim upon which relief could be granted.

A panel of the Court of Appeals affirmed the rejection of a substantive due process claim, but found that respondent had alleged a cognizable procedural due process claim.  307 F. 3d 1258 (CA10 2002).  On rehearing en banc, a divided court reached the same disposition, concluding that respondent had a "protected property interest in the enforcement of the terms of her restraining order" and that the town had deprived her of due process because "the police never 'heard' nor seriously entertained her request to enforce and protect her interests in the restraining order."  366 F. 3d, at 1101, 1117.  We granted certiorari.  543 U. S. ___ (2004).

———————

[3] Three police officers were also named as defendants in the complaint, but the Court of Appeals concluded that they were entitled to qualified immunity, 366 F. 3d 1093, 1118 (CA10 2004) (en banc). Respondent did not file a cross-petition challenging that aspect of the judgment.

## II

The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." Amdt. 14, §1. In 42 U. S. C. §1983, Congress has created a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Respondent claims the benefit of this provision on the ground that she had a property interest in police enforcement of the restraining order against her husband; and that the town deprived her of this property without due process by having a policy that tolerated nonenforcement of restraining orders.

As the Court of Appeals recognized, we left a similar question unanswered in *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S. 189 (1989), another case with "undeniably tragic" facts: Local child-protection officials had failed to protect a young boy from beatings by his father that left him severely brain damaged. *Id.,* at 191–193. We held that the so-called "substantive" component of the Due Process Clause does not "requir[e] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.,* at 195. We noted, however, that the petitioner had not properly preserved the argument that—and we thus "decline[d] to consider" whether—state "child protection statutes gave [him] an 'entitlement' to receive protective services in accordance with the terms of the statute, an entitlement which would enjoy due process protection." *Id.,* at 195, n. 2.

The procedural component of the Due Process Clause does not protect everything that might be described as a "benefit": "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges* v. *Roth,* 408 U. S.

564, 577 (1972). Such entitlements are "'of course, . . . not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Paul* v. *Davis,* 424 U. S. 693, 709 (1976) (quoting *Roth, supra,* at 577); see also *Phillips* v. *Washington Legal Foundation,* 524 U. S. 156, 164 (1998).

### A

Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. See, *e.g., Kentucky Dept. of Corrections* v. *Thompson,* 490 U. S. 454, 462–463 (1989). The Court of Appeals in this case determined that Colorado law created an entitlement to enforcement of the restraining order because the "court-issued restraining order . . . specifically dictated that its terms must be enforced" and a "state statute command[ed]" enforcement of the order when certain objective conditions were met (probable cause to believe that the order had been violated and that the object of the order had received notice of its existence). 366 F. 3d, at 1101, n. 5; see also *id.,* at 1100, n. 4; *id.,* at 1104–1105, and n. 9. Respondent contends that we are obliged "to give deference to the Tenth Circuit's analysis of Colorado law on" whether she had an entitlement to enforcement of the restraining order. Tr. of Oral Arg. 52.

We will not, of course, defer to the Tenth Circuit on the ultimate issue: whether what Colorado law has given respondent constitutes a property interest for purposes of the Fourteenth Amendment. That determination, despite its state-law underpinnings, is ultimately one of federal constitutional law. "Although the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Memphis*

*Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 9 (1978) (emphasis added) (quoting *Roth, supra,* at 577); cf. *United States ex rel. TVA* v. *Powelson,* 319 U. S. 266, 279 (1943). Resolution of the federal issue begins, however, with a determination of what it is that state law provides. In the context of the present case, the central state-law question is whether Colorado law gave respondent a right to police enforcement of the restraining order. It is on this point that respondent's call for deference to the Tenth Circuit is relevant.

We have said that a "presumption of deference [is] given the views of a federal court as to the law of a State within its jurisdiction." *Phillips, supra,* at 167. That presumption can be overcome, however, see *Leavitt* v. *Jane L.,* 518 U. S. 137, 145 (1996) *(per curiam),* and we think deference inappropriate here. The Tenth Circuit's opinion, which reversed the Colorado District Judge, did not draw upon a deep well of state-specific expertise, but consisted primarily of quoting language from the restraining order, the statutory text, and a state-legislative-hearing transcript. See 366 F. 3d, at 1103–1109. These texts, moreover, say nothing distinctive to Colorado, but use mandatory language that (as we shall discuss) appears in many state and federal statutes. As for case law: the only state-law cases about restraining orders that the Court of Appeals relied upon were decisions of Federal District Courts in Ohio and Pennsylvania and state courts in New Jersey, Oregon, and Tennessee. *Id.,* at 1104–1105, n. 9, 1109.[4] Moreover, if we were

———————

[4] Most of the Colorado-law cases cited by the Court of Appeals appeared in footnotes declaring them to be irrelevant because they involved only substantive due process (366 F. 3d, at 1100–1101, nn. 4–5), only statutes without restraining orders (*id.,* at 1101, n. 5), or Colorado's Government Immunity Act, which the Court of Appeals concluded applies "only to . . . state tort law claims" (*id.,* at 1108–1109, n. 12). Our analysis is likewise unaffected by the Immunity Act or by the way that Colorado has dealt with substantive due process or cases

simply to accept the Court of Appeals' conclusion, we would necessarily have to decide conclusively a federal constitutional question (*i.e.*, whether such an entitlement constituted property under the Due Process Clause and, if so, whether petitioner's customs or policies provided too little process to protect it). We proceed, then, to our own analysis of whether Colorado law gave respondent a right to enforcement of the restraining order.[5]

## B

The critical language in the restraining order came not from any part of the order itself (which was signed by the state-court trial judge and directed to the restrained party, respondent's husband), but from the preprinted notice to law-enforcement personnel that appeared on the back of the order. See *supra,* at 2–3. That notice effectively restated the statutory provision describing "peace officers' duties" related to the crime of violation of a restraining order. At the time of the conduct at issue in this case, that provision read as follows:

> "(a) Whenever a restraining order is issued, the protected person shall be provided with a copy of such order. *A peace officer shall use every reasonable means to enforce a restraining order.*
>
> "(b) *A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a*

────────────

that do not involve restraining orders.

[5] In something of an anyone-but-us approach, the dissent simultaneously (and thus unpersuasively) contends not only that this Court should certify a question to the Colorado Supreme Court, *post,* at 5–7 (opinion of STEVENS, J.), but also that it should defer to the Tenth Circuit (which itself did not certify any such question), *post,* at 3–4. No party in this case has requested certification, even as an alternative disposition. See Tr. of Oral Arg. 56 (petitioner's counsel "disfavor[ing]" certification); *id.,* at 25–26 (counsel for the United States arguing against certification). At oral argument, in fact, respondent's counsel declined JUSTICE STEVENS' invitation to request it. *Id.,* at 53.

*warrant for the arrest of a restrained person* when the peace officer has information amounting to probable cause that:

"(I) The restrained person has violated or attempted to violate any provision of a restraining order; and

"(II) The restrained person has been properly served with a copy of the restraining order or the restrained person has received actual notice of the existence and substance of such order.

"(c) In making the probable cause determination described in paragraph (b) of this subsection (3), a peace officer shall assume that the information received from the registry is accurate. *A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.*" Colo. Rev. Stat. §18–6–803.5(3) (Lexis 1999) (emphases added).

The Court of Appeals concluded that this statutory provision—especially taken in conjunction with a statement from its legislative history,[6] and with another statute restricting criminal and civil liability for officers making arrests[7]—established the Colorado Legislature's clear

———————

[6] The Court of Appeals quoted one lawmaker's description of how the bill "'would really attack the domestic violence problems'":

"'[T]he entire criminal justice system must act in a consistent manner, which does not now occur. The police must make probable cause arrests. The prosecutors must prosecute every case. Judges must apply appropriate sentences, and probation officers must monitor their probationers closely. And the offender needs to be sentenced to offender-specific therapy.

"'[T]he entire system must send the same message . . . [that] violence is criminal. And so we hope that House Bill 1253 starts us down this road.'" 366 F. 3d, at 1107 (quoting Tr. of Colorado House Judiciary Hearings on House Bill 1253, Feb. 15, 1994) (emphases omitted).

[7] Under Colo. Rev. Stat. §18–6–803.5(5) (Lexis 1999), "[a] peace officer arresting a person for violating a restraining order or otherwise enforcing a restraining order" was not to be held civilly or criminally liable

intent "to alter the fact that the police were not enforcing domestic abuse retraining orders," and thus its intent "that the recipient of a domestic abuse restraining order have an entitlement to its enforcement." 366 F. 3d, at 1108. Any other result, it said, "would render domestic abuse restraining orders utterly valueless." *Id.,* at 1109.

This last statement is sheer hyperbole. Whether or not respondent had a right to enforce the restraining order, it rendered certain otherwise lawful conduct by her husband both criminal and in contempt of court. See §§18–6–803.5(2)(a), (7). The creation of grounds on which he could be arrested, criminally prosecuted, and held in contempt was hardly "valueless"—even if the prospect of those sanctions ultimately failed to prevent him from committing three murders and a suicide.

We do not believe that these provisions of Colorado law truly made enforcement of restraining orders *mandatory*. A well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes.

> "In each and every state there are long-standing statutes that, by their terms, seem to preclude nonenforcement by the police. . . . However, for a number of reasons, including their legislative history, insufficient resources, and sheer physical impossibility, it has been recognized that such statutes cannot be interpreted literally. . . . [T]hey clearly do not mean that a police officer may not lawfully decline to make an arrest. As to third parties in these states, the full-enforcement statutes simply have no effect, and their significance is further diminished." 1 ABA Standards for Criminal Justice 1–4.5, commentary, pp. 1–124 to 1–125 (2d ed. 1980) (footnotes omitted).

———————

unless he acted "in bad faith and with malice" or violated "rules adopted by the Colorado supreme court."

The deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands, is illustrated by *Chicago* v. *Morales,* 527 U. S. 41 (1999), which involved an ordinance that said a police officer "'shall order'" persons to disperse in certain circumstances, *id.,* at 47, n. 2. This Court rejected out of hand the possibility that "the mandatory language of the ordinance . . . afford[ed] the police *no* discretion." *Id.,* at 62, n. 32. It is, the Court proclaimed, simply "common sense that *all* police officers must use some discretion in deciding when and where to enforce city ordinances." *Ibid.* (emphasis added).

Against that backdrop, a true mandate of police action would require some stronger indication from the Colorado Legislature than "shall use every reasonable means to enforce a restraining order" (or even "shall arrest . . . or . . . seek a warrant"), §§18–6–803.5(3)(a), (b). That language is not perceptibly more mandatory than the Colorado statute which has long told municipal chiefs of police that they "shall pursue and arrest any person fleeing from justice in any part of the state" and that they "shall apprehend any person in the act of committing any offense . . . and, forthwith and without any warrant, bring such person before a . . . competent authority for examination and trial." Colo. Rev. Stat. §31–4–112 (Lexis 2004). It is hard to imagine that a Colorado peace officer would not have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.[8] The practical neces-

---

[8]Respondent in fact concedes that an officer may "properly" decide not to enforce a restraining order when the officer deems "a technical violation" too "immaterial" to justify arrest. Respondent explains this as a determination that there is no probable cause. Brief for Respondent 28. We think, however, that a determination of no probable cause

sity for discretion is particularly apparent in a case such as this one, where the suspected violator is not actually present and his whereabouts are unknown. Cf. *Donaldson* v. *Seattle,* 65 Wash. App. 661, 671–672, 831 P. 2d 1098, 1104 (1992) ("There is a vast difference between a mandatory duty to arrest [a violator who is on the scene] and a mandatory duty to conduct a follow up investigation [to locate an absent violator]. . . . A mandatory duty to investigate would be completely open-ended as to priority, duration and intensity").

The dissent correctly points out that, in the specific context of domestic violence, mandatory-arrest statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes. *Post,* at 7–13 (opinion of STEVENS, J.). The Colorado statute mandating arrest for a domestic-violence offense is different from but related to the one at issue here, and it includes similar though not identical phrasing. See Colo. Rev. Stat. §18–6–803.6(1) (Lexis 1999) ("When a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence . . . has been committed, the officer shall, without undue delay, arrest the person suspected of its commission . . ."). Even in the domestic-violence context, however, it is unclear how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested. As the dissent explains, *post,* at 9–10, and n. 8, much of the impetus for mandatory-arrest statutes and policies derived from the idea that it is better for police officers to arrest the aggressor in a domestic-violence incident than to attempt to mediate the dispute or merely to ask the offender to leave the scene. Those other options are only available, of course, when the offender is present at the scene. See

———————

to believe a violation has occurred is quite different from a determination that the violation is too insignificant to pursue.

Hanna, No Right to Choose: Mandated Victim Participation in Domestic Violence Prosecutions, 109 Harv. L. Rev. 1849, 1860 (1996) ("[T]he clear trend in police practice is to arrest the batterer *at the scene . . .*" (emphasis added)).

As one of the cases cited by the dissent, *post,* at 12, recognized, "there will be situations when no arrest is possible, *such as when the alleged abuser is not in the home.*" *Donaldson,* 65 Wash. App., at 674, 831 P. 2d, at 1105 (emphasis added). That case held that Washington's mandatory-arrest statute required an arrest only in "cases where the offender is on the scene," and that it "d[id] not create an on-going mandatory duty to conduct an investigation" to locate the offender. *Id.,* at 675, 831 P. 2d, at 1105. Colorado's restraining-order statute appears to contemplate a similar distinction, providing that when arrest is "impractical"—which was likely the case when the whereabouts of respondent's husband were unknown—the officers' statutory duty is to "seek a warrant" rather than "arrest." §18–6–803.5(3)(b).

Respondent does not specify the precise means of enforcement that the Colorado restraining-order statute assertedly mandated—whether her interest lay in having police arrest her husband, having them seek a warrant for his arrest, or having them "use every reasonable means, up to and including arrest, to enforce the order's terms," Brief for Respondent 29–30.[9] Such indeterminacy is not the hallmark of a duty that is mandatory. Nor can someone be safely deemed "entitled" to something when the

—————

[9] Respondent characterizes her entitlement in various ways. See Brief for Respondent 12 ("'entitlement' to receive protective services"); *id.,* at 13 ("interest in police enforcement action"); *id.,* at 14 ("specific government benefit" consisting of "the government service of enforcing the objective terms of the court order protecting her and her children against her abusive husband"); *id.,* at 32 ("[T]he restraining order here mandated the arrest of Mr. Gonzales under specified circumstances, or at a minimum required the use of reasonable means to enforce the order").

identity of the alleged entitlement is vague. See *Roth,* 408 U. S., at 577 (considering whether "certain benefits" were "secure[d]" by rule or understandings); cf. *Natale* v. *Ridgefield,* 170 F. 3d 258, 263 (CA2 1999) ("There is no reason . . . to restrict the 'uncertainty' that will preclude existence of a federally protectable property interest to the uncertainty that inheres in the exercise of discretion"). The dissent, after suggesting various formulations of the entitlement in question,[10] ultimately contends that the obligations under the statute were quite precise: either make an arrest or (if that is impractical) seek an arrest warrant, *post,* at 14. The problem with this is that the seeking of an arrest warrant would be an entitlement to nothing but procedure—which we have held inadequate even to support standing, see *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555 (1992); much less can it be the basis for a property interest. See *post,* at 3–4 (SOUTER, J., concurring). After the warrant is sought, it remains within the discretion of a judge whether to grant it, and after it is granted, it remains within the discretion of the police whether and when to execute it.[11] Respondent would have been assured nothing but the seeking of a warrant. This is not the sort of "entitlement" out of which a property interest is created.

Even if the statute could be said to have made enforcement of restraining orders "mandatory" because of the

───────────

[10] See *post,* at 1 ("entitlement to police protection"); *post,* at 2 ("entitlement to mandatory individual protection by the local police force"); *ibid.* ("a right to police assistance"); *post,* at 8 ("a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances"); *post,* at 18 ("respondent's property interest in the enforcement of her restraining order"); *post,* at 20 (the "service" of "protection from her husband"); *post,* at 21–22 ("interest in the enforcement of the restraining order").

[11] The dissent asserts that the police would lack discretion in the execution of this warrant, *post,* at 13–14, n. 12, but cites no statute mandating immediate execution. The general Colorado statute governing arrest provides that police "may arrest" when they possess a warrant "commanding" arrest. Colo. Rev. Stat. §16–3–102(1) (Lexis 1999).

domestic-violence context of the underlying statute, that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate. Making the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people. See, *e.g., Sandin* v. *Conner,* 515 U. S. 472, 482 (1995) (finding no constitutionally protected liberty interest in prison regulations phrased in mandatory terms, in part because "[s]uch guidelines are not set forth solely to benefit the prisoner"). The serving of public rather than private ends is the normal course of the criminal law because criminal acts, "besides the injury [they do] to individuals, . . . strike at the very being of society; which cannot possibly subsist, where actions of this sort are suffered to escape with impunity." 4 W. Blackstone, Commentaries on the Laws of England 5 (1769); see also *Huntington* v. *Attrill,* 146 U. S. 657, 668 (1892). This principle underlies, for example, a Colorado district attorney's discretion to prosecute a domestic assault, even though the victim withdraws her charge. See *People* v. *Cunefare,* 102 P. 3d 302, 311–312 (Colo. 2004) (Bender, J., concurring in part, dissenting in part, and dissenting in part to the judgment).

Respondent's alleged interest stems only from a State's *statutory* scheme—from a restraining order that was authorized by and tracked precisely the statute on which the Court of Appeals relied. She does not assert that she has any common-law or contractual entitlement to enforcement. If she was given a statutory entitlement, we would expect to see some indication of that in the statute itself. Although Colorado's statute spoke of "protected person[s]" such as respondent, it did so in connection with matters other than a right to enforcement. It said that a "protected person shall be provided with a copy of [a restraining] order" when it is issued, §18–6–803.5(3)(a); that a law enforcement agency "shall make all reasonable

efforts to contact the protected party upon the arrest of the restrained person," §18–6–803.5(3)(d); and that the agency "shall give [to the protected person] a copy" of the report it submits to the court that issued the order, §18–6–803.5(3)(e). Perhaps most importantly, the statute spoke directly to the protected person's power to "initiate contempt proceedings against the restrained person if the order [was] issued in a civil action or request the prosecuting attorney to initiate contempt proceedings if the order [was] issued in a criminal action." §18–6–803.5(7). The protected person's express power to "initiate" civil contempt proceedings contrasts tellingly with the mere ability to "request" initiation of criminal contempt proceedings—and even more dramatically with the complete silence about any power to "request" (much less demand) that an arrest be made.

The creation of a personal entitlement to something as vague and novel as enforcement of restraining orders cannot "simply g[o] without saying." *Post,* at 17, n. 16 (STEVENS, J., dissenting). We conclude that Colorado has not created such an entitlement.

C

Even if we were to think otherwise concerning the creation of an entitlement by Colorado, it is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a "property" interest for purposes of the Due Process Clause. Such a right would not, of course, resemble any traditional conception of property. Although that alone does not disqualify it from due process protection, as *Roth* and its progeny show, the right to have a restraining order enforced does not "have some ascertainable monetary value," as even our *"Roth*-type property-as-entitlement" cases have implicitly required. Merrill, The Landscape of Constitutional Prop-

erty, 86 Va. L. Rev. 885, 964 (2000).[12]   Perhaps most radically, the alleged property interest here arises *incidentally,* not out of some new species of government benefit or service, but out of a function that government actors have always performed—to wit, arresting people who they have probable cause to believe have committed a criminal offense.[13]

The indirect nature of a benefit was fatal to the due process claim of the nursing-home residents in *O'Bannon* v. *Town Court Nursing Center,* 447 U. S. 773 (1980). We held that, while the withdrawal of "direct benefits" (financial payments under Medicaid for certain medical services) triggered due process protections, *id.,* at 786–787, the same was not true for the "indirect benefit[s]" conferred on Medicaid patients when the Government enforced "minimum standards of care" for nursing-home facilities, *id.,* at 787. "[A]n indirect and incidental result of the Government's enforcement action . . . does not amount to a depri-

_____

[12] The dissent suggests that the interest in having a restraining order enforced does have an ascertainable monetary value, because one may "contract with a private security firm . . . to provide protection" for one's family. *Post,* at 2, 20, and n. 18. That is, of course, not as precise as the analogy between public and private schooling that the dissent invokes. *Post,* at 20, n. 18. Respondent probably could have hired a private firm to guard her house, to prevent her husband from coming onto the property, and perhaps even to search for her husband after she discovered that her children were missing. Her alleged entitlement here, however, does not consist in an abstract right to "protection," but (according to the dissent) in enforcement of her restraining order through the arrest of her husband, or the seeking of a warrant for his arrest, after she gave the police probable cause to believe the restraining order had been violated. A private person would not have the power to arrest under those circumstances because the crime would not have occurred in his presence. Colo. Rev. Stat. §16–3–201 (Lexis 1999). And, needless to say, a private person would not have the power to obtain an arrest warrant.

[13] In other contexts, we have explained that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 619 (1973).

vation of any interest in life, liberty, or property." *Ibid.* In this case, as in *O'Bannon,* "[t]he simple distinction between government action that directly affects a citizen's legal rights . . . and action that is directed against a third party and affects the citizen only indirectly or incidentally, provides a sufficient answer to" respondent's reliance on cases that found government-provided services to be entitlements. *Id.,* at 788. The *O'Bannon* Court expressly noted, *ibid.,* that the distinction between direct and indirect benefits distinguished *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1 (1978), one of the government-services cases on which the dissent relies, *post,* at 19.

## III

We conclude, therefore, that respondent did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her husband. It is accordingly unnecessary to address the Court of Appeals' determination (366 F. 3d, at 1110–1117) that the town's custom or policy prevented the police from giving her due process when they deprived her of that alleged interest. See *American Mfrs. Mut. Ins. Co.* v. *Sullivan,* 526 U. S. 40, 61 (1999).[14]

In light of today's decision and that in *DeShaney,* the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations. This result reflects our continuing reluctance to treat the Fourteenth Amendment as "'a font of tort law,'" *Parratt* v. *Taylor,* 451 U. S. 527, 544 (1981) (quoting *Paul* v. *Davis,* 424 U. S., at 701), but it does not mean States are powerless to

---

[14] Because we simply do not address whether the process would have been adequate if respondent had had a property interest, the dissent is correct to note that we do not "contest" the point, *post,* at 2. Of course we do not *accept* it either.

provide victims with personally enforceable remedies. Although the framers of the Fourteenth Amendment and the Civil Rights Act of 1871, 17 Stat. 13 (the original source of §1983), did not create a system by which police departments are generally held financially accountable for crimes that better policing might have prevented, the people of Colorado are free to craft such a system under state law. Cf. *DeShaney,* 489 U. S., at 203.[15]

The judgment of the Court of Appeals is

*Reversed.*

---

[15] In Colorado, the general statutory immunity for government employees does not apply when "the act or omission causing . . . injury was willful and wanton." Colo. Rev. Stat. §24–10–118(2)(a) (Lexis 1999). Respondent's complaint does allege that the police officers' actions "were taken either willfully, recklessly or with such gross negligence as to indicate wanton disregard and deliberate indifference to" her civil rights. App. to Pet. for Cert. 128a.

The state cases cited by the dissent that afford a cause of action for police failure to enforce restraining orders, *post,* at 11–12, 14–15, n. 13, vindicate state common-law or statutory tort claims—not procedural due process claims under the Federal Constitution. See *Donaldson* v. *Seattle,* 65 Wash. App. 661, 881 P. 2d 1098 (1992) (city could be liable under some circumstances for *per se* negligence in failing to meet statutory duty to arrest); *Matthews* v. *Pickett County,* 996 S. W. 2d 162 (Tenn. 1999) (county could be liable under Tennessee's Governmental Tort Liability Act where restraining order created a special duty); *Campbell* v. *Campbell,* 294 N. J. Super. 18, 682 A. 2d 272 (1996) (rejecting four specific defenses under the New Jersey Tort Claims Act in negligence action against individual officers); *Sorichetti* v. *New York,* 65 N. Y. 2d 461, 482 N. E. 2d 70 (1985) (city breached duty of care arising from special relationship between police and victim); *Nearing* v. *Weaver,* 295 Ore. 702, 670 P. 2d 137 (1983) (statutory duty to individual plaintiffs arising independently of tort-law duty of care).

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–278

———————

TOWN OF CASTLE ROCK, COLORADO, PETITIONER
*v.* JESSICA GONZALES, INDIVIDUALLY AND AS NEXT
BEST FRIEND OF HER DECEASED MINOR CHILDREN,
REBECCA GONZALES, KATHERYN
GONZALES, AND LESLIE
GONZALES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 27, 2005]

JUSTICE SOUTER, with whom JUSTICE BREYER joins,
concurring.

I agree with the Court that Jessica Gonzales has shown
no violation of an interest protected by the Fourteenth
Amendment's Due Process Clause, and I join the Court's
opinion. The Court emphasizes the traditional public
focus of law enforcement as reason to doubt that these
particular legal requirements to provide police services,
however unconditional their form, presuppose enforceable
individual rights to a certain level of police protection.
*Ante*, at 15–16. The Court also notes that the terms of the
Colorado statute involved here recognize and preserve the
traditional discretion afforded law enforcement officers.
*Ante*, at 11–15, and n. 8. Gonzales's claim of a property
right thus runs up against police discretion in the face of
an individual demand to enforce, and discretion to ignore
an individual instruction not to enforce (because, say, of a
domestic reconciliation); no one would argue that the
beneficiary of a Colorado order like the one here would be
authorized to control a court's contempt power or order the
police to refrain from arresting. These considerations

argue against inferring any guarantee of a level of protection or safety that could be understood as the object of a "legitimate claim of entitlement," *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972), in the nature of property arising under Colorado law.* Consequently, the classic predicate for federal due process protection of interests under state law is missing.

Gonzales implicitly recognizes this, when she makes the following argument:

> "Ms. Gonzales alleges that . . . she was denied the process laid out in the statute. The police did not consider her request in a timely fashion, but instead repeatedly required her to call the station over several hours. The statute promised a process by which her restraining order would be given vitality through careful and prompt consideration of an enforcement request . . . . Denial of that process drained all of the value from her property interest in the restraining order." Brief for Respondent 10.

The argument is unconventional because the state-law benefit for which it claims federal procedural protection is itself a variety of procedural regulation, a set of rules to be followed by officers exercising the State's executive power: use all reasonable means to enforce, arrest upon demonstrable probable cause, get a warrant, and so on, see *ante*, at 2–3.

When her argument is understood as unconventional in this sense, a further reason appears for rejecting its call to apply *Roth*, a reason that would apply even if the statutory mandates to the police were absolute, leaving the police with no discretion when the beneficiary of a protective order insists upon its enforcement. The Due Process Clause extends procedural protection to guard against

---

*Gonzales does not claim to have a protected liberty interest.

unfair deprivation by state officials of substantive state-law property rights or entitlements; the federal process protects the property created by state law. But Gonzales claims a property interest in a state-mandated process in and of itself. This argument is at odds with the rule that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim* v. *Wakine-kona,* 461 U. S. 238, 250 (1983); see also *Doe by Fein* v. *District of Columbia*, 93 F. 3d 861, 868 (CADC 1996) *(per curiam); Doe by Nelson* v. *Milwaukee County*, 903 F. 2d 499, 502–503 (CA7 1990). In putting to rest the notion that the scope of an otherwise discernible property interest could be limited by related state-law procedures, this Court observed that "[t]he categories of substance and procedure are distinct. . . . 'Property' cannot be defined by the procedures provided for its deprivation." *Cleveland Bd. of Ed.* v. *Loudermill,* 470 U. S. 532, 541 (1985). Just as a State cannot diminish a property right, once conferred, by attaching less than generous procedure to its deprivation, *ibid.*, neither does a State create a property right merely by ordaining beneficial procedure unconnected to some articulable substantive guarantee. This is not to say that state rules of executive procedure may not provide significant reasons to infer an articulable property right meant to be protected; but it is to say that we have not identified property with procedure as such. State rules of executive procedure, however important, may be nothing more than rules of executive procedure.

Thus, in every instance of property recognized by this Court as calling for federal procedural protection, the property has been distinguishable from the procedural obligations imposed on state officials to protect it. Whether welfare benefits, *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), attendance at public schools, *Goss* v. *Lopez,* 419 U. S. 565 (1975), utility services, *Memphis Light, Gas &*

*Water Div.* v. *Craft,* 436 U. S. 1 (1978), public employment, *Perry* v. *Sindermann,* 408 U. S. 593 (1972), professional licenses, *Barry* v. *Barchi,* 443 U. S. 55 (1979), and so on, the property interest recognized in our cases has always existed apart from state procedural protection before the Court has recognized a constitutional claim to protection by federal process. To accede to Gonzales's argument would therefore work a sea change in the scope of federal due process, for she seeks federal process as a substitute simply for state process. (And she seeks damages under Rev. Stat. §1979, 42 U. S. C. §1983, for denial of process to which she claimed a federal right.) There is no articulable distinction between the object of Gonzales's asserted entitlement and the process she desires in order to protect her entitlement; both amount to certain steps to be taken by the police to protect her family and herself. Gonzales's claim would thus take us beyond *Roth* or any other recognized theory of Fourteenth Amendment due process, by collapsing the distinction between property protected and the process that protects it, and would federalize every mandatory state-law direction to executive officers whose performance on the job can be vitally significant to individuals affected.

The procedural directions involved here are just that. They presuppose no enforceable substantive entitlement, and *Roth* does not raise them to federally enforceable status in the name of due process.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–278

———————

## TOWN OF CASTLE ROCK, COLORADO, PETITIONER *v.* JESSICA GONZALES, INDIVIDUALLY AND AS NEXT BEST FRIEND OF HER DECEASED MINOR CHILDREN, REBECCA GONZALES, KATHERYN GONZALES, AND LESLIE GONZALES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 27, 2005]

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

The issue presented to us is much narrower than is suggested by the far-ranging arguments of the parties and their *amici*. Neither the tragic facts of the case, nor the importance of according proper deference to law enforcement professionals, should divert our attention from that issue. That issue is whether the restraining order entered by the Colorado trial court on June 4, 1999, created a "property" interest that is protected from arbitrary deprivation by the Due Process Clause of the Fourteenth Amendment.

It is perfectly clear, on the one hand, that neither the Federal Constitution itself, nor any federal statute, granted respondent or her children any individual entitlement to police protection. See *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S. 189 (1989). Nor, I assume, does any Colorado statute create any such entitlement for the ordinary citizen. On the other hand, it is equally clear that federal law imposes no impediment to the creation of such an entitlement by Colorado law.

Respondent certainly could have entered into a contract with a private security firm, obligating the firm to provide protection to respondent's family; respondent's interest in such a contract would unquestionably constitute "property" within the meaning of the Due Process Clause. If a Colorado statute enacted for her benefit, or a valid order entered by a Colorado judge, created the functional equivalent of such a private contract by granting respondent an entitlement to mandatory individual protection by the local police force, that state-created right would also qualify as "property" entitled to constitutional protection.

I do not understand the majority to rule out the foregoing propositions, although it does express doubts. See *ante*, at 17 ("[I]t is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest"). Moreover, the majority does not contest, see *ante*, at 18, that if respondent did have a cognizable property interest in this case, the deprivation of that interest violated due process. As the Court notes, respondent has alleged that she presented the police with a copy of the restraining order issued by the Colorado court and requested that it be enforced. *Ante*, at 2, n. 1. In response, she contends, the officers effectively ignored her. If these allegations are true, a federal statute, Rev. Stat. §1979, 42 U. S. C. §1983, provides her with a remedy against the petitioner, even if Colorado law does not. See *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532 (1985).

The central question in this case is therefore whether, as a matter of Colorado law, respondent had a right to police assistance comparable to the right she would have possessed to any other service the government or a private firm might have undertaken to provide. See *Board of Regents of State Colleges* v. *Roth,* 408 U. S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are

defined by existing rules or understandings that stem from an independent source such as state law—rules or under- standings that secure certain benefits and that support claims of entitlement to those benefits").

There was a time when our tradition of judicial restraint would have led this Court to defer to the judgment of more qualified tribunals in seeking the correct answer to that difficult question of Colorado law. Unfortunately, al- though the majority properly identifies the "central state- law question" in this case as "whether Colorado law gave respondent a right to police enforcement of the restraining order," *ante,* at 8, it has chosen to ignore our settled prac- tice by providing its *own* answer to that question. Before identifying the flaws in the Court's ruling on the merits, I shall briefly comment on our past practice.

## I

The majority's decision to plunge ahead with its own analysis of Colorado law imprudently departs from this Court's longstanding policy of paying "deference [to] the views of a federal court as to the law of a State within its jurisdiction." *Phillips* v. *Washington Legal Foundation*, 524 U. S. 156, 167 (1998); see also *Bishop* v. *Wood*, 426 U. S. 341, 346, and n. 10 (1976) (collecting cases). This policy is not only efficient, but it reflects "our belief that district courts and courts of appeal are better schooled in and more able to interpret the laws of their respective States." *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491, 500–501 (1985); *Hillsborough* v. *Cromwell*, 326 U. S. 620, 629–630 (1946) (endorsing "great deference to the views of the judges of those courts 'who are familiar with the intri- cacies and trends of local law and practice'"). Accordingly, we have declined to show deference only in rare cases in which the court of appeal's resolution of state law was "clearly wrong" or otherwise seriously deficient. See *Brockett*, 472 U. S., at 500, n. 9; accord, *Leavitt* v. *Jane L.*,

518 U. S. 137, 145 (1996) *(per curiam).*

Unfortunately, the Court does not even attempt to demonstrate that the six-judge en banc majority was "clearly wrong" in its interpretation of Colorado's domestic restraining order statute; nor could such a showing be made. For it is certainly *plausible* to construe "*shall* use every reasonable means to enforce a restraining order" and "*shall* arrest," Colo. Rev. Stat. §§18–6–803.5(3)(a)–(b) (Lexis 1999) (emphases added), as conveying mandatory directives to the police, particularly when the same statute, at other times, tellingly employs different language that suggests police discretion, see §18–6–803.5(6)(a) ("A peace officer *is authorized to* use every reasonable means to protect . . ."; "Such peace officer *may* transport . . ." (emphases added)).[1] Moreover, unlike today's decision, the Court of Appeals was attentive to the legislative history of the statute, focusing on a statement by the statute's sponsor in the Colorado House, *ante,* at 10, n. 6 (quoting statement), which it took to "emphasiz[e] the importance of the police's mandatory enforcement of domestic restraining orders." 366 F. 3d 1093, 1107 (CA10 2004) (en banc). Far from overlooking the traditional presumption of police discretion, then, the Court of Appeals' diligent analysis of the statute's text, purpose, and history led it to conclude that the Colorado Legislature intended precisely to abrogate that presumption in the specific context of domestic restraining orders. That conclusion is eminently reasonable and, I believe, worthy of our deference.[2]

———————

[1] The Court of Appeals also looked to other provisions of the statute to inform its analysis. In particular, it reasoned that a provision that gave police officers qualified immunity in connection with their enforcement of restraining orders, see Colo. Rev. Stat. §18–6–803.5(5) (Lexis 1999), supported the inference that the Colorado Legislature intended mandatory enforcement. See 366 F. 3d 1093, 1108 (CA10 2004) (en banc).

[2] The Court declines to show deference for the odd reason that, in its

## II

Even if the Court had good reason to doubt the Court of Appeals' determination of state law, it would, in my judgment, be a far wiser course to certify the question to the Colorado Supreme Court.[3]  Powerful considerations support certification in this case.  First, principles of federalism and comity favor giving a State's high court the opportunity to answer important questions of state law, particularly when those questions implicate uniquely local matters such as law enforcement and might well require the weighing of policy considerations for their correct resolution.[4]  See *Elkins* v. *Moreno*, 435 U. S. 647, 662,

———————

view, the Court of Appeals did not "draw upon a deep well of state-specific expertise," *ante*, at 8, but rather examined the statute's text and legislative history and distinguished arguably relevant Colorado case law.  See *ante*, at 8–9, and n. 4.  This rationale makes a mockery of our traditional practice, for it is precisely when there is no state law on point that the presumption that circuits have local expertise plays any useful role.  When a circuit's resolution of a novel question of state law is grounded on a concededly complete review of all the pertinent state-law materials, that decision is entitled to deference.  Additionally, it should be noted that this is not a case in which the Court of Appeals and the District Court disagreed on the relevant issue of state law; rather, those courts disagreed only over the extent to which a probable-cause determination requires the exercise of discretion.  Compare 366 F. 3d, at 1105–1110, with App. to Pet. for Cert. 122a (District Court opinion).

[3] See Colo. Rule App. Proc. 21.1(a) (Colorado Supreme Court may answer questions of law certified to it by the Supreme Court of the United States or another federal court if those questions "may be determinative of the cause" and "as to which it appears to the certifying court there is no controlling precedent in the decisions of the [Colorado] Supreme Court").

[4] See *City of Westminster* v. *Dogan Constr. Co.*, 930 P. 2d 585, 590 (Colo. 1997) (en banc) (in interpreting an ambiguous statute, the Colorado Supreme Court will consider legislative history and the "consequences of a particular construction"); *ibid.* ("'Because we also presume that legislation is intended to have just and reasonable effects, we must construe statutes accordingly and apply them so as to ensure such results'").  Additionally, it is possible that the Colorado Supreme

n. 16 (1978) (*sua sponte* certifying a question of state law because it is "one in which state governments have the highest interest"); cf. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 77 (1997) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save 'time, energy, and resources, and hel[p] build a cooperative judicial federalism'" (brackets in original)).[5]  Second, by certifying a potentially dispositive state-law issue, the Court would adhere to its wise policy of avoiding the unnecessary adjudication of difficult questions of constitutional law.  See *Elkins*, 435 U. S., at 661–662 (citing constitutional avoidance as a factor supporting certification).  Third, certification would promote both judicial economy and fairness to the parties.  After all, the Colorado Supreme Court is the ultimate authority on the meaning of Colorado law, and if in later litigation it should disagree with this Court's provisional state-law holding, our efforts will have been wasted and respondent will have been deprived of the opportunity to have her claims heard under the authoritative view of Colorado law.  The unique facts of this case only serve to emphasize the importance

———————

Court would have better access to (and greater facility with) relevant pieces of legislative history beyond those that we have before us.  That court may also choose to give certain evidence of legislative intent greater weight than would be customary for this Court.  See, *e.g.,* Brief for Peggy Kerns et al. as *Amici Curiae* in Support of Respondent (bill sponsor explaining the Colorado General Assembly's intent in passing the domestic restraining order statute).

[5] Citing similar considerations, the Second Circuit certified questions of state law to the Connecticut Supreme Court when it was faced with a procedural due process claim involving a statute that arguably mandated the removal of children upon probable cause of child abuse.  See *Sealed* v. *Sealed*, 332 F. 3d 51 (2003).  The Connecticut Supreme Court accepted certification and held that the provision was discretionary, not mandatory.  See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 865 A. 2d 428 (2005).

of employing a procedure that will provide the correct answer to the central question of state law. See *Brockett*, 472 U. S., at 510 (O'CONNOR, J., concurring) ("Speculation by a federal court about the meaning of a state statute in the absence of a prior state court adjudication is particularly gratuitous when, as is the case here, the state courts stand willing to address questions of state law on certification from a federal court").[6]

## III

Three flaws in the Court's rather superficial analysis of the merits highlight the unwisdom of its decision to answer the state-law question *de novo*. First, the Court places undue weight on the various statutes throughout the country that seemingly mandate police enforcement but are generally understood to preserve police discretion. As a result, the Court gives short shrift to the unique case of "mandatory arrest" statutes in the domestic violence context; States passed a wave of these statutes in the 1980's and 1990's with the unmistakable goal of eliminat-

───────────

[6] The Court is correct that I would take an "anyone-but-us approach," *ante*, at 9, n. 5, to the question of *who* decides the issue of Colorado law in this case. Both options that I favor—deferring to the Circuit's interpretation or, barring that, certifying to the Colorado Supreme Court—recognize the comparative expertise of another tribunal on questions of state law. And both options offer their own efficiencies. By contrast, the Court's somewhat overconfident "only us" approach lacks any cogent justification. The fact that neither party requested certification certainly cannot be a sufficient reason for dismissing that option. As with abstention, the considerations that weigh in favor of certification—federal-state comity, constitutional avoidance, judicial efficiency, the desire to settle correctly a recurring issue of state law—transcend the interests of individual litigants, rendering it imprudent to cast them as gatekeepers to the procedure. See, *e.g., Elkins* v. *Moreno*, 435 U. S. 647, 662 (1978) (certifying state-law issue absent a request from the parties); *Aldrich* v. *Aldrich*, 375 U. S. 249 (1963) *(per curiam)* (same); see also 17A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §4248, p. 176 (2d ed. 1988) ("Ordinarily a court will order certification on its own motion").

ing police discretion in this area. Second, the Court's formalistic analysis fails to take seriously the fact that the Colorado statute at issue in this case was enacted for the benefit of the narrow class of persons who are beneficiaries of domestic restraining orders, and that the order at issue in this case was specifically intended to provide protection to respondent and her children. Finally, the Court is simply wrong to assert that a citizen's interest in the government's commitment to provide police enforcement in certain defined circumstances does not resemble any "traditional conception of property," *ante*, at 17; in fact, a citizen's property interest in such a commitment is just as concrete and worthy of protection as her interest in any other important service the government or a private firm has undertaken to provide.

In 1994, the Colorado General Assembly passed omnibus legislation targeting domestic violence. The part of the legislation at issue in this case mandates enforcement of a domestic restraining order upon probable cause of a violation, §18–6–803.5(3), while another part directs that police officers "shall, without undue delay, arrest" a suspect upon "probable cause to believe that a crime or offense of domestic violence has been committed," §18–6–803.6(1).[7] In adopting this legislation, the Colorado Gen-

_____

[7] See Fuller & Stansberry, 1994 Legislature Strengthens Domestic Violence Protective Orders, 23 Colo. Lawyer 2327 (1994) ("The 1994 Colorado legislative session produced several significant domestic abuse bills that strengthened both civil and criminal restraining order laws and procedures for victims of domestic violence"); *id.*, at 2329 ("Although many law enforcement jurisdictions already take a proactive approach to domestic violence, arrest and procedural policies vary greatly from one jurisdiction to another. H. B. 94–1253 mandates the arrest of domestic violence perpetrators and restraining order violaters. H. B. 94–1090 repeals the requirement that protected parties show a copy of their restraining order to enforcing officers. In the past, failure to provide a copy of the restraining order has led to hesitation from police to enforce the order for fear of an illegal arrest. The new statute

eral Assembly joined a nationwide movement of States
that took aim at the crisis of police underenforcement in
the domestic violence sphere by implementing "manda-
tory arrest" statutes. The crisis of underenforcement had
various causes, not least of which was the perception by
police departments and police officers that domestic vio-
lence was a private, "family" matter and that arrest was to
be used as a last resort. Sack, Battered Women and the
State: The Struggle for the Future of Domestic Violence
Policy, 2004 Wis. L. Rev. 1657, 1662–1663 (hereinafter
Sack); *id.*, at 1663 ("Because these cases were considered
noncriminal, police assigned domestic violence calls low
priority and often did not respond to them for several
hours or ignored them altogether"). In response to these
realities, and emboldened by a well-known 1984 experi-
ment by the Minneapolis police department,[8] "many states
enacted mandatory arrest statutes under which a police
officer must arrest an abuser when the officer has prob-
able cause to believe that a domestic assault has occurred

———————

also shields arresting officers from liability; this is expected to reduce
concerns about enforcing the mandatory arrest requirements" (foot-
notes omitted)).

[8] See Sack 1669 ("The movement to strengthen arrest policies was
bolstered in 1984 by the publication of the results of a study on manda-
tory arrest in domestic violence cases that had been conducted in
Minneapolis. In this study, police handled randomly assigned domestic
violence offenders by using one of three different responses: arresting
the offender, mediating the dispute or requiring the offender to leave
the house for eight hours. The study concluded that in comparison with
the other two responses, arrest had a significantly greater impact on
reducing domestic violence recidivism. The findings from the Minnea-
polis study were used by the U. S. Attorney General in a report issued
in 1984 that recommended, among other things, arrest in domestic
violence cases as the standard law enforcement response" (footnotes
omitted)); see also Zorza, The Criminal Law of Misdemeanor Domestic
Violence, 1970–1990, 83 J. Crim. L. & C. 46, 63–65 (1992) (tracing
history of mandatory arrest laws and noting that the first such law was
implemented by Oregon in 1977).

or that a protection order has been violated." Developments in the Law: Legal Responses to Domestic Violence, 106 Harv. L. Rev. 1498, 1537 (1993). The purpose of these statutes was precisely to "counter police resistance to arrests in domestic violence cases by removing or restricting police officer discretion; mandatory arrest policies would increase police response and reduce batterer recidivism." Sack 1670.

Thus, when Colorado passed its statute in 1994, it joined the ranks of 15 States that mandated arrest for domestic violence offenses and 19 States that mandated arrest for domestic restraining order violations. See Developments in the Law, 106 Harv. L. Rev., at 1537, n. 68 (noting statutes in 1993); N. Miller, Institute for Law and Justice, A Law Enforcement and Prosecution Perspective 7, and n. 74, 8, and n. 90 (2003), http://www.ilj.org/dv/dvvawa2000.htm (as visited June 24, 2005, and available in Clerk of Court's case file) (listing Colorado among the many States that currently have mandatory arrest statutes).[9]

Given the specific purpose of these statutes, there can be no doubt that the Colorado Legislature used the term "shall" advisedly in its domestic restraining order statute. While "shall" is probably best read to mean "may" in other Colorado statutes that seemingly mandate enforcement, cf. Colo. Rev. Stat. §31–4–112 (Lexis 2004) (police "*shall suppress* all riots, disturbances or breaches of the peace, *shall apprehend* all disorderly persons in the city . . ." (emphases added)), it is clear that the elimination of police discretion was integral to Colorado and its fellow States'

_____

[9] See also Brief for International Municipal Lawyers Association and National League of Cities, National's Sheriff's Association, and County Sheriffs of Colorado as *Amici Curiae* in Support of Petitioner 6 ("Colorado is not alone in mandating the arrest of persons who violate protective orders. Some 19 states require an arrest when a police officer has probable cause to believe that such orders have been violated" (collecting statutes)).

solution to the problem of underenforcement in domestic violence cases.[10]  Since the text of Colorado's statute perfectly captures this legislative purpose, it is hard to imagine what the Court has in mind when it insists on "some stronger indication from the Colorado Legislature." *Ante*, at 12.

While Colorado case law does not speak to the question, it is instructive that other state courts interpreting their analogous statutes have not only held that they eliminate the police's traditional discretion to refuse enforcement, but have also recognized that they create rights enforceable against the police under state law.  For example, in *Nearing* v. *Weaver*, 295 Ore. 702, 670 P. 2d 137 (1983) (en banc), the court held that although the common law of negligence did not support a suit against the police for failing to enforce a domestic restraining order, the stat-

_____

[10] See Note, Mandatory Arrest: A Step Toward Eradicating Domestic Violence, But is It Enough? 1996 U. Ill. L. Rev. 533, 542, 544–546 (describing the problems that attend a discretionary arrest regime: "Even when probable clause is present, police officers still frequently try to calm the parties and act as mediators. . . . Three studies found the arrest rate to range between 3% and 10% when the decision to arrest is left to police discretion.  Another study found that the police made arrests in only 13% of the cases where the victim had visible injuries. . . . Police officers often employ irrelevant criteria such as the 'reason' for the abuse or the severity of the victim's injuries in making their decision to arrest. . . . Some [officers] may feel strongly that police should not interfere in family arguments or lovers' quarrels.  Such attitudes make police much more likely to investigate intent and provocation, and consider them as mitigating factors, in responding to domestic violence calls than in other types of cases"); see also Walsh, The Mandatory Arrest Law: Police Reaction, 16 Pace L. Rev. 97, 98 (1995).  Cf. Sack 1671–1672 ("Mandatory arrest policies have significantly increased the number of arrests of batterers for domestic violence crimes. . . . In New York City, from 1993, the time the mandatory arrest policy was instituted, to 1999, felony domestic violence arrests increased 33%, misdemeanor domestic violence arrests rose 114%, and arrests for violation of orders of protection were up 76%" (footnotes omitted)).

ute's mandatory directive formed the basis for the suit because it was "a specific duty imposed by statute for the benefit of individuals previously identified by judicial order." *Id.*, at 707, 670 P. 2d, at 140.[11]  In *Matthews* v. *Pickett County,* 996 S. W. 2d 162 (Tenn. 1999) (on certification to the Sixth Circuit), the court confirmed that the statute mandated arrest for violations of domestic restraining orders, and it held that the "public duty" defense to a negligence action was unavailable to the defendant police officers because the restraining order had created a "special duty" to protect the plaintiff. *Id.*, at 165.  See also *Campbell* v. *Campbell*, 294 N. J. Super. 18, 24, 682 A. 2d 272, 274 (1996) (domestic restraining order statute "allows no discretion" with regard to arrest; "[t]he duty imposed on the police officer is ministerial"); *Donaldson* v. *Seattle*, 65 Wash. App. 661, 670, 831 P. 2d 1098, 1103 (1992) ("Generally, where an officer has legal grounds to make an arrest he has considerable discretion to do so.  In regard to domestic violence, the rule is the reverse.  If the officer has the legal grounds to arrest pursuant to the statute, he has a mandatory duty to make the arrest").  To what extent the Colorado Supreme Court would agree with the views of these courts is, of course, an open question, but it does seem rather brazen for the majority to assume that the Colorado Supreme Court would repudiate this consistent line of persuasive authority from other States.

Indeed, the Court fails to come to terms with the wave of domestic violence statutes that provides the crucial context for understanding Colorado's law.  The Court concedes that, "in the specific context of domestic violence,

---

[11] The Oregon Supreme Court noted that the "widespread refusal or failure of police officers to remove persons involved in episodes of domestic violence was presented to the legislature as the main reason for tightening the law so as to require enforcement of restraining orders by mandatory arrest and custody."  *Nearing*, 295 Ore., at 709, 670 P. 2d, at 142.

mandatory-arrest statutes have been found in some States to be more mandatory than traditional mandatory-arrest statutes," *ante*, at 13, but that is a serious understatement. The difference is not a matter of degree, but of kind. Before this wave of statutes, the legal rule was one of discretion; as the Court shows, the "traditional," general mandatory arrest statutes have always been understood to be "mandatory" in name only, see *ante*, at 11. The innovation of the domestic violence statutes was to make police enforcement, not "more mandatory," but simply *mandatory*. If, as the Court says, the existence of a protected "entitlement" turns on whether "government officials may grant or deny it in their discretion," *ante*, at 7, the new mandatory statutes undeniably create an entitlement to police enforcement of restraining orders.

Perhaps recognizing this point, the Court glosses over the dispositive question—whether the police enjoyed discretion to deny enforcement—and focuses on a different question—which "precise means of enforcement," *ante*, at 14, were called for in this case. But that question is a red herring. The statute directs that, upon probable cause of a violation, "a peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person." Colo. Rev. Stat. §18–6–803.5(3)(b) (Lexis 1999). Regardless of whether the enforcement called for in this case was arrest or the seeking of an arrest warrant (the answer to that question probably changed over the course of the night as the respondent gave the police more information about the husband's whereabouts), the crucial point is that, under the statute, the police were *required* to provide enforcement; *they lacked the discretion to do nothing.*[12] The Court

_____

[12] Under the Court's reading of the statute, a police officer with probable cause is mandated to seek an arrest warrant if arrest is "impractical under the circumstances," but then enjoys unfettered discretion in

suggests that the fact that "enforcement" may encompass different acts infects any entitlement to enforcement with "indeterminacy." *Ante*, at 14. But this objection is also unfounded. Our cases have never required the object of an entitlement to be some mechanistic, unitary thing. Suppose a State entitled every citizen whose income was under a certain level to receive health care at a state clinic. The provision of health care is not a unitary thing—doctors and administrators must decide what tests are called for and what procedures are required, and these decisions often involve difficult applications of judgment. But it could not credibly be said that a citizen lacks an entitlement to health care simply because the content of that entitlement is not the same in every given situation. Similarly, the enforcement of a restraining order is not some amorphous, indeterminate thing. Under the statute, if the police have probable cause that a violation has occurred, enforcement consists of either making an immediate arrest or seeking a warrant and then executing an arrest—traditional, well-defined tasks that law enforcement officers perform every day.[13]

———————

deciding whether to *execute* that warrant. *Ante*, at 15. This is an unlikely reading given that the statute was motivated by a profound distrust of police discretion in the domestic violence context and motivated by a desire to improve the protection given to holders of domestic restraining orders. We do not have the benefit of an authoritative construction of Colorado law, but I would think that if an estranged husband harassed his wife in violation of a restraining order, and then absconded after she called the police, the statute would not only obligate the police to seek an arrest warrant, but also obligate them to execute it by making an arrest. In any event, under respondent's allegations, by the time the police were informed of the husband's whereabouts, an arrest was practical and, under the statute's terms, mandatory.

[13] The Court wonders "how the mandatory-arrest paradigm applies to cases in which the offender is not present to be arrested." *Ante*, at 13. Again, questions as to the *scope* of the obligation to provide enforcement are far afield from the key issue—whether there exists an enti-

The Court similarly errs in speculating that the Colorado Legislature may have mandated police enforcement of restraining orders for "various legitimate ends other than the conferral of a benefit on a specific class of people," *ante*, at 15; see also *ibid.* (noting that the "serving of public rather than private ends is the normal course of the criminal law"). While the Court's concern would have

_____

tlement to enforcement. In any event, the Court's speculations are off-base. First, this is not a case like *Donaldson* v. *Seattle*, 65 Wash. App. 661, 831 P. 2d 1098 (1992), in which the restrained person violated the order and then left the scene. Here, not only did the husband violate the restraining order by coming within 100 yards of the family home, but he continued to violate the order while his abduction of the daughters persisted. This is because the restraining order prohibited him from "molest[ing] or disturb[ing] the peace" of the daughters. See 366 F. 3d, at 1143 (appendix to dissent of O'Brien, J.). Because the "scene" of the violation was wherever the husband was currently holding the daughters, this case does not implicate the question of an officer's duties to arrest a person who has left the scene and is no longer in violation of the restraining order. Second, to the extent that arresting the husband was initially "impractical under the circumstances" because his whereabouts were unknown, the Colorado statute (unlike some other States' statutes) expressly addressed that situation—it *required* the police to seek an arrest warrant. Third, the Court is wrong to suggest that this case falls outside the core situation that these types of statutes were meant to address. One of the well-known cases that contributed to the passage of these statutes involved facts similar to this case. See *Sorichetti* v. *New York City*, 65 N. Y. 2d 461, 467, 482 N. E. 2d 70, 74 (1985) (police officers at police station essentially ignored a mother's pleas for enforcement of a restraining order against an estranged husband who made threats about their 6-year-old daughter; hours later, as the mother persisted in her pleas, the daughter was found mutilated, her father having attacked her with a fork and a knife and attempted to saw off her leg); Note, 1996 U. Ill. L. Rev., at 539 (noting *Sorichetti* in the development of mandatory arrest statutes); see also Sack 1663 (citing the police's failure to respond to domestic violence calls as an impetus behind mandatory arrest statutes). It would be singularly odd to suppose that in passing its sweeping omnibus domestic violence legislation, the Colorado Legislature did not mean to require enforcement in the case of an abduction of children in violation of a restraining order.

some bite were we faced with a broadly drawn statute directing, for example, that the police "*shall suppress* all riots," there is little doubt that the statute at issue in this case conferred a benefit "on a specific class of people"—namely, recipients of domestic restraining orders.  Here, respondent applied for and was granted a restraining order from a Colorado trial judge, who found a risk of "irreparable injury" and found that "physical or emotional harm" would result if the husband were not excluded from the family home.  366 F. 3d, at 1143 (appendix to dissent of O'Brien, J.).  As noted earlier, the restraining order required that the husband not "molest or disturb" the peace of respondent and the daughters, and it ordered (with limited exceptions) that the husband stay at least 100 yards away from the family home.  *Ibid.*[14]  It also directed the police to "use every reasonable means to enforce this . . . order," and to arrest or seek a warrant upon probable cause of a violation.  *Id.*, at 1144.  Under the terms of the statute, when the order issued, respondent and her daughters became "'protected person[s].'"  §18–6–803.5(1.5)(a) ("'Protected person' means the person or persons identified in the restraining order as the person or persons for whose benefit the restraining order was issued").[15]  The statute criminalized the knowing violation of the restraining order, §18–6–803.5(1), and, as already

———————

[14] The order also stated: "If you violate this order thinking that the other party or child named in this order has given you permission, you are wrong, and can be arrested and prosecuted.  The terms of this order cannot be changed by agreement of the other party or the child(ren), only the court can change this order."  366 F. 3d, at 1144 (appendix to dissent of O'Brien, J.).

[15] A concern for the "'protected person'" pervades the statute.  For example, the statute provides that a "peace officer may transport, or obtain transportation for, the alleged victim to shelter.  Upon the request of the protected person, the peace officer may also transport the minor child of the protected person, who is not an emancipated minor, to the same shelter . . . ."  §18–6–803.5(6)(a).

discussed, the statute (as well as the order itself) mandated police enforcement, §§18–6–803.5(3)(a)–(b).[16]

Because the statute's guarantee of police enforcement is triggered by, and operates only in reference to, a judge's granting of a restraining order in favor of an identified "'protected person,'" there is simply no room to suggest that such a person has received merely an "'incidental'" or "'indirect'" benefit, see *ante*, at 18. As one state court put it, domestic restraining order statutes "identify with precision when, to whom, and under what circumstances police protection must be afforded. The legislative purpose in requiring the police to enforce individual restraining orders clearly is to protect the named persons for whose protection the order is issued, not to protect the community at large by general law enforcement activity." *Nearing*, 295 Ore., at 712, 670 P. 2d, at 143.[17] Not only does

_____

[16] I find it neither surprising nor telling, cf. *ante*, at 15, that the statute requires the restraining order to contain, "in capital letters and bold print," a "notice" informing protected persons that they can demand or request, respectively, civil and criminal contempt proceedings. §18–6–803.5(7). While the legislature may have thought that these legal remedies were not popularly understood, a person's right to "demand" or "request" police enforcement of a restraining order simply goes without saying given the nature of the order and its language. Indeed, for a holder of a restraining order who has read the order's emphatic language, it would likely come as quite a shock to learn that she has no right to demand enforcement in the event of a violation. To suggest that a protected person has no such right would posit a lacuna between a protected person's rights and an officer's duties—a result that would be hard to reconcile with the Colorado Legislature's dual goals of putting an end to police indifference and empowering potential victims of domestic abuse.

[17] See also *Matthews* v. *Pickett County,* 996 S. W. 2d 162, 165 (Tenn. 1999) ("The order of protection in this case was not issued for the public's protection in general. The order of protection specifically identified Ms. Matthews and was issued solely for the purpose of protecting her. *Cf. Ezell* [v. *Cockrell*, 902 S. W. 2d 394, 403 (Tenn. 1995)] (statute prohibiting drunk driving does not specify an individual but undertakes to protect the public in general from intoxicated driv-

the Court's doubt about whether Colorado's statute cre-
ated an entitlement in a protected person fail to take
seriously the purpose and nature of restraining orders, but
it fails to account for the decisions by other state courts,
see *supra* at 11–12, that recognize that such statutes and
restraining orders create individual rights to police action.

## IV

Given that Colorado law has quite clearly eliminated
the police's discretion to deny enforcement, respondent is
correct that she had much more than a "unilateral expec-
tation" that the restraining order would be enforced;
rather, she had a "legitimate claim of entitlement" to
enforcement. *Roth,* 408 U. S., at 577. Recognizing respon-
dent's property interest in the enforcement of her restrain-
ing order is fully consistent with our precedent. This
Court has "made clear that the property interests pro-
tected by procedural due process extend well beyond ac-
tual ownership of real estate, chattels, or money." *Id.*, at
571–572. The "types of interests protected as 'property'
are varied and, as often as not, intangible, 'relating to the
whole domain of social and economic fact.'" *Logan* v.
*Zimmerman Brush Co.*, 455 U. S. 422, 430 (1982); see
also *Perry* v. *Sindermann*, 408 U. S. 593, 601 (1972)
("'[P]roperty' interests subject to procedural due process
protection are not limited by a few rigid, technical forms.
Rather, 'property' denotes a broad range of interests that
are secured by 'existing rules or understandings'"). Thus,
our cases have found "property" interests in a number of
state-conferred benefits and services, including welfare
benefits*, Goldberg* v. *Kelly*, 397 U. S. 254 (1970); disability
benefits, *Mathews* v. *Eldridge*, 424 U. S. 319 (1976); public

--------

ers)"); *Sorichetti*, 65 N. Y. 2d, at 469, 482 N. E. 2d, at 75 ("The [protec-
tive] order evinces a preincident legislative and judicial determination
that its holder should be accorded a reasonable degree of protection
from a particular individual").

education, *Goss* v. *Lopez*, 419 U. S. 565 (1975); utility services, *Memphis Light, Gas & Water Div.* v. *Craft*, 436 U. S. 1 (1978); government employment, *Cleveland Bd. of Ed.* v. *Loudermill*, 470 U. S. 532 (1985); as well as in other entitlements that defy easy categorization, see, *e.g.*, *Bell* v. *Burson*, 402 U. S. 535 (1971) (due process requires fair procedures before a driver's license may be revoked pending the adjudication of an accident claim); *Logan*, 455 U. S., at 431 (due process prohibits the arbitrary denial of a person's interest in adjudicating a claim before a state commission).

Police enforcement of a restraining order is a government service that is no less concrete and no less valuable than other government services, such as education.[18] The relative novelty of recognizing this type of property interest is explained by the relative novelty of the domestic violence statutes creating a mandatory arrest duty; before this innovation, the unfettered discretion that characterized police enforcement defeated any citizen's "legitimate claim of entitlement" to this service. Novel or not, respondent's claim finds strong support in the principles that underlie our due process jurisprudence. In this case, Colorado law *guaranteed* the provision of a certain service, in certain defined circumstances, to a certain class of

––––––––––

[18] The Court mistakenly relies on *O'Bannon* v. *Town Court Nursing Center*, 447 U. S. 773 (1980), in explaining why it is "by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause." *Ante*, at 17. In *O'Bannon*, the question was essentially whether certain regulations provided nursing-home residents with an entitlement to continued residence in the home of their choice. 447 U. S., at 785. The Court concluded that the regulations created no such entitlement, but there was no suggestion that Congress could not create one if it wanted to. In other words, *O'Bannon* did not address a situation in which the underlying law created an entitlement, but the Court nevertheless refused to treat that entitlement as a property interest within the meaning of the Due Process Clause.

beneficiaries, and respondent reasonably relied on that guarantee. As we observed in *Roth*, "[i]t is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." 408 U. S., at 577. Surely, if respondent had contracted with a private security firm to provide her and her daughters with protection from her husband, it would be apparent that she possessed a property interest in such a contract. Here, Colorado undertook a comparable obligation, and respondent—with restraining order in hand—justifiably relied on that undertaking. Respondent's claim of entitlement to this promised service is no less legitimate than the other claims our cases have upheld, and no less concrete than a hypothetical agreement with a private firm.[19] The fact that it is based on a statutory enactment and a judicial

———————

[19] As the analogy to a private security contract demonstrates, a person's interest in police enforcement has "'some ascertainable monetary value,'" *ante*, at 17. Cf. Merrill, The Landscape of Constitutional Property, 86 Va. L. Rev. 885, 964, n. 289 (2000) (remarking, with regard to the property interest recognized in *Goss* v. *Lopez*, 419 U. S. 565 (1975), that "any parent who has contemplated sending their children to private schools knows that public schooling has a monetary value"). And while the analogy to a private security contract need not be precise to be useful, I would point out that the Court is likely incorrect in stating that private security guards could not have arrested the husband under the circumstances, see *ante*, at 17, n. 10. Because the husband's ongoing abduction of the daughters would constitute a knowing violation of the restraining order, see n. 13, *supra*, and therefore a crime under the statute, see §18–6–803.5(1), a private person who was at the scene and aware of the circumstances of the abduction would have authority to arrest. See §16–3–201 ("A person who is not a peace officer may arrest another person when any crime has been or is being committed by the arrested person in the presence of the person making the arrest"). Our cases, of course, have never recognized any requirement that a property interest possess "'some ascertainable monetary value.'" Regardless, I would assume that respondent would have paid the police to arrest her husband if that had been possible; at the very least, the entitlement has a monetary value in that sense.

order entered for her special protection, rather than on a formal contract, does not provide a principled basis for refusing to consider it "property" worthy of constitutional protection.[20]

## V

Because respondent had a property interest in the en-

---

[20] According to JUSTICE SOUTER, respondent has asserted a property interest in merely a "state-mandated process," *ante*, at 3 (opinion concurring in part and concurring in judgment), rather than in a state-mandated "substantive guarantee," *ibid*. This misunderstands respondent's claim. Putting aside the inartful passage of respondent's brief that JUSTICE SOUTER relies upon, *ante*, at 2, it is clear that respondent is in fact asserting a substantive interest in the "enforcement of the restraining order." Brief for Respondent 10. Enforcement of a restraining order is a tangible, substantive act. If an estranged husband violates a restraining order by abducting children, and the police succeed in enforcing the order, the person holding the restraining order has undeniably just received a substantive benefit. As in other procedural due process cases, respondent is arguing that the police officers failed to follow fair procedures in ascertaining whether the statutory criteria that trigger their obligation to provide enforcement—*i.e.*, an outstanding order plus probable cause that it is being violated—were satisfied in her case. Cf. *Carey* v. *Piphus*, 435 U. S. 247, 266–267 (1978) (discussing analytic difference between the denial of fair process and the denial of the substantive benefit itself). It is JUSTICE SOUTER, not respondent, who makes the mistake of "collapsing the distinction between property protected and the process that protects it," *ante*, at 4.

JUSTICE SOUTER also errs in suggesting that respondent cannot have a property interest in enforcement because she would not be authorized to instruct the police to refrain from enforcement in the event of a violation. *Ante*, at 1. The right to insist on the provision of a service is separate from the right to refuse the service. For example, compulsory attendance laws deny minors the right to refuse to attend school. Nevertheless, we have recognized that minors have a property interest in public education and that school officials must therefore follow fair procedures when they seek to deprive minors of this valuable benefit through suspension. See *Goss*, 419 U. S. 565. In the end, JUSTICE SOUTER overlooks the core purpose of procedural due process—ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action.

forcement of the restraining order, state officials could not deprive her of that interest without observing fair procedures.[21]  Her description of the police behavior in this case and the department's callous policy of failing to respond properly to reports of restraining order violations clearly alleges a due process violation.  At the very least, due process requires that the relevant state decisionmaker *listen* to the claimant and then *apply the relevant criteria* in reaching his decision.[22]  The failure to observe these minimal procedural safeguards creates an unacceptable risk of arbitrary and "erroneous deprivation[s]," *Mathews*, 424 U. S., at 335.  According to respondent's complaint—which we must construe liberally at this early stage in the litigation, see *Swierkiewicz* v. *Sorema N. A.,* 534 U. S. 506, 514 (2002)—the process she was afforded by the police constituted nothing more than a "'sham or a pretense.'" *Joint Anti-Fascist Refugee Comm.* v. *McGrath,* 341 U. S. 123, 164 (1951) (Frankfurter, J., concurring).

Accordingly, I respectfully dissent.

--------

[21] See *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422, 432 (1982) ("'"While the legislature may elect not to confer a property interest, . . . it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards"'").

[22] See *Fuentes* v. *Shevin*, 407 U. S. 67, 81 (1972) ("[W]hen a person has an opportunity to speak up in his own defense, and *when the State must listen to what he has to say*, substantively unfair and simply mistaken deprivations of property interests can be prevented" (emphasis added)); *Bell* v. *Burson*, 402 U. S. 535, 542 (1971) ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet [the] standard [of due process]"); *Goldberg* v. *Kelly*, 397 U. S. 254, 271 (1970) ("[T]he decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing"); cf. *ibid.* ("[O]f course, an impartial decision maker is essential").